## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **ROBERT L. BENDER and DEBORAH A.** | * | |
| **BENDER** | * | |
| | * | |
| **v.** | * | **Civil Action No. CCB-18-979** |
| | * | |
| | * | |
| **ELMORE & THROOP, P.C.** | * | |
| | ****** | |

## <u>MEMORANDUM</u>

This is an action brought under the Fair Debt Collection Practices Act ("FDCPA") concerning defendant Elmore & Throop, P.C. ("Elmore")'s efforts to collect supposedly outstanding assessment payments due to the Country Walk Community Association ("the HOA") to which the plaintiffs, Robert L. Bender and Deborah A. Bender ("the Benders"), belong by virtue of their ownership of a residential property located within the HOA. The court previously dismissed this action after concluding that it was barred by the FDCPA's one-year statute of limitations. *See Bender v. Elmore & Throop, P.C. ("Bender I")*, 375 F. Supp. 3d 632, 638 (D. Md. 2019). Following the United States Court of Appeals for the Fourth Circuit's decision that the Benders have alleged at least two potential violations of the FDCPA that are not time-barred, the dismissal was vacated and the case was remanded to this court. *See Bender v. Elmore & Throop, P.C. ("Bender II")*, 963 F.3d 403, 408 (4th Cir. 2020). Elmore renewed its earlier motion to dismiss or, in the alternative, for summary judgment. (ECF 27).[1] The motion is fully briefed and

---

[1] In its motion, Elmore reasserted and incorporated the arguments and exhibits it presented in its initial motion (ECF 12) as alternative bases for dismissal if the Benders' claims were not barred by the statute of limitations. The court considers those arguments and exhibits, along with the exhibits the Benders presented in their opposition to Elmore's initial motion (ECF 13).

1

ready for resolution without a hearing. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, the motion will be granted in part and denied in part.

## BACKGROUND

For purposes of this motion, the court will give an abbreviated recitation of the facts relevant to the dispute. The court refers to its previous opinion for a further recitation of the facts of this case. *See Bender I*, 375 F. Supp. 3d at 633–35.

The HOA is governed by the Amended and Restated Declaration of Covenants, Conditions and Restrictions ("Declaration"). As relevant to this case, Article IV, Section 1 of the Declaration provides for annual and special assessments to be levied by the HOA. (ECF 12-4, Decl., Art. IV § 1). "The annual and special assessments, together with interest, costs and reasonable attorney's fees, shall be a charge on the Lot[.] . . . Each such assessment, together with interest, costs and reasonable attorney's fees, shall also be the personal obligation of the person who was the Owner of such property at the time when the assessment fell due." (*Id.*). The due dates for the assessments "shall be established by the Board of Directors." (*Id.* § 10). Article IV, Section 11 details the effect of nonpayment of the assessments and the remedies of the HOA.

> If an Owner does not pay an assessment as it becomes due, then the Association may bring an action at law against said Owner. Any assessment not paid within thirty (30) days after the due date shall bear interest from the due date at a rate of twelve percent (12%) per annum or at other such rate, not exceeding that charged by Harford County, Maryland for delinquent real estate tax payments, as the Board of Directors may establish from time to time.

(*Id.* § 11). Lot owners are also "subject to a late fee equal to $10.00 per month for each month that the assessment remains unpaid." (*Id.*). Should the HOA bring an action against an owner over unpaid assessments, "the Owner will also be obligated to pay the [HOA]'s reasonable attorneys' fees." (*Id.*).

2

Elmore has represented the HOA since 2006 as its general legal counsel in matters relating to association administration, management, operation and protection. (ECF 12-3, E. Throop Aff. ¶ 3; ECF 13-15, Fee Agreement at 1). The Fee Agreement between Elmore and the HOA contemplates that Elmore will be paid for services involved in the collection of delinquent assessments. Although "[c]osts and expenses incurred by [Elmore] will be billed to [the HOA]," those costs and expenses "will be assessed against the delinquent account." (ECF 13-15, Fee Agreement at 2).

On April 16, 2016, the Benders found a letter from Elmore, dated February 26, 2016, taped to their door, claiming that they had failed to pay $77.09 in assessment charges that had accrued from October 1, 2015, through February 29, 2016, and stating that they were now obligated to pay $1,048.60 (or $1,096.52) to satisfy their debt and to cover fees, costs, and attorneys' fees incurred by their delinquency. (ECF 13-1, R. Bender Decl. ¶ 9; ECF 13-2, Feb. 26, 2016 Ltr.). Between April and May 2016, the Benders and Elmore exchanged correspondence in which the Benders denied having made late payments and Elmore persisted in maintaining that late fees, costs, interest, and attorneys' fees were owed. (ECF 13-1, R. Bender Decl. ¶¶ 12–20; ECFs 13-3–13-6). On May 18, 2016, following one of Elmore's demands for payment, the Benders delivered a letter to Elmore requesting that it cease communicating with them about the debt. (ECF 13-1, R. Bender Decl. ¶ 28; ECF 13-7, May 18, 2016 Ltr.).

In January 2018, after having been banned from the property at which HOA meetings were normally held,[2] Mr. Bender commenced an effort to attend the 2018 annual meeting of the HOA

---

[2] Mr. Bender was banned from the property after his attendance of the annual meeting in January 2017, at which he attempted to submit certain quarterly payment assessments due to the HOA. (ECF 13-1, R. Bender Decl. ¶¶ 23–24). There are no additional details in the record about what transpired at this meeting, other than Mr. Bender's assertions that while he "never raised his voice

by sending a letter to its Board of Directors requesting that either the meeting's location be changed or its date rescheduled for a time after his ban would expire and asking that someone call him to discuss his request. (ECF 13-1, R. Bender Decl. ¶¶ 33–34; ECF 12-7, Jan. 16, 2018 Ltr.). Shortly after sending the letter, Mr. Bender received a voicemail from Ellen Throop (of defendant Elmore & Throop, P.C.), stating that she was calling to discuss his letter. (ECF 13-1, R. Bender Decl. ¶ 36). Mr. Bender returned the call. Initially, Mr. Bender and Ms. Throop discussed Mr. Bender's request to attend the annual meeting, with Ms. Throop asserting that he did not have the right to personally attend and Mr. Bender contending that a Maryland statute gave him the absolute right to be present in person. (*Id.* ¶¶ 37–38). The conversation apparently became increasingly unproductive; Mr. Bender acknowledges that they were "g[etting] nowhere," and the two began to disagree over the reasons why Mr. Bender had been banned in the first place. (*Id.* ¶ 38). Ms. Throop asserted that Mr. Bender's behavior toward Frederick Traut was the reason, and Mr. Bender disputed this. (*Id.* ¶ 39). Eventually, Ms. Throop remarked, "[W]ell, this whole thing would not have happened if you would just pay your bills." (*Id.* ¶ 40). In response to this statement, Mr. Bender insisted they were current, prompting Ms. Throop to read over information in the Benders' updated account ledger and to inform Mr. Bender that there was now a lien against the property. (*Id.* ¶¶ 41–44). Ms. Throop instead asserts that "Mr. Bender changed the subject of the conversation by contesting the reason for his ban, and denying that his account for assessments was delinquent." (ECF 12-3, E. Throop Decl. ¶ 8).

After this conversation, on February 6, 2018, the Benders received an account verification letter listing the outstanding debt, which states that it was "sent to provide you with a verification

---

or disrupted the meeting," Ms. Throop claimed that he was banned "for harassing" the president of the property management company that was hosting the meeting, Frederick Traut. (*Id.* ¶¶ 6, 22–24, 39).

of your account as you requested." (ECF 12-5, Feb. 6, 2018 Ltr. at 1). The Benders deny requesting

such verification. (R. Bender Decl. ¶ 49). The letter states a balance owed of $1,487.63, and

includes an attachment titled "Account Ledger," which breaks down the balance owed into several

categories, including assessments ($37.25), late fees ($133.00), interest (at a rate of six percent)

($50.48), "other," ($287.00), attorneys' fees ($570.00), and lien costs ($409.90). (ECF 12-5,

Account Ledger).

## STANDARD OF REVIEW

Elmore moves to dismiss this case for failure to state a claim under Fed. R. Civ. P. 12(b)(6)

or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. A court considers only the

pleadings when deciding a Rule 12(b)(6) motion. Where the parties present matters outside of the

pleadings and the court considers those matters, as here, the motion is treated as one for summary

judgment. *See* Fed. R. Civ. P. 12(d); *Gadsby by Gadsby v. Grasmick*, 109 F.3d 940, 949 (4th Cir.

1997); *Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F. Supp. 2d 551, 556 (D. Md. 2003).

"There are two requirements for a proper Rule 12(d) conversion." *Greater Baltimore Ctr. for*

*Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir.

2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6)

motion as a motion for summary judgment," which can be satisfied when a party is "aware that

material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985);

*see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998)

(commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second

requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a

reasonable opportunity for discovery.'" *Greater Baltimore*, 721 F.3d at 281.

The Benders have adequate notice that Elmore's motion might be treated as one for

summary judgment. The motion's alternative caption and attached materials are in themselves sufficient indicia. *See Laughlin*, 149 F.3d at 260-61. Moreover, the Benders refer to the motion in their opposition brief as one for summary judgment and rely on additional documentary exhibits. If the Benders had thought that they needed additional evidence to oppose summary judgment, Rule 56(d), which they have not invoked, afforded them the opportunity to seek further discovery through an affidavit. *See* Fed. R. Civ. P. 56(d); *see also Greater Baltimore*, 721 F.3d at 281 ("[The defendant] took 'the proper course' when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery.'") (citation omitted); *Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56([d])). Therefore, the court will consider affidavits and additional materials submitted by the parties and will treat Elmore's motion as one for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Anderson*, 477 U.S. at 247–48. The court must view the evidence in the light most favorable to the nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all reasonable inferences in

that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). At the same time, the court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## DISCUSSION

The Benders concede that only two communications between them and Elmore fall within the applicable statute of limitations period—the phone call between Ms. Throop and Mr. Bender on January 17, 2018 and the February 6, 2018, verification letter sent by Elmore. (ECF 29, Opp'n at 10). They allege three violations of the FDCPA stemming from these communications. First, the Benders allege that Elmore violated 15 U.S.C. § 1692c(c) by communicating with them with respect to the debt during the phone call and via the verification letter after they notified Elmore in writing that they wished Elmore to cease communication with them.[3] Second, the Benders claim that Elmore's attempt to collect through the verification letter was false, deceptive, or misleading, in violation of 15 U.S.C. § 1692e[4] and unfair or unconscionable, in violation of 15 U.S.C. § 1692f,[5] because it attempted to collect charges that are not payment obligations under the Declaration and stated inaccurate or unreasonable fees.

---

[3] Section 1692c(c) of the FDCPA provides: "If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt," subject to three enumerated exceptions not applicable here.

[4] "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

[5] "A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

"The FDCPA protects consumers from abusive and deceptive practices by debt collectors, and protects non-abusive debt collectors from competitive disadvantage." *United States v. Nat'l Fin. Servs., Inc.*, 98 F.3d 131, 135 (4th Cir. 1996). To prevail on an FDCPA claim, a plaintiff must prove that (1) they have been the "object of collection activity arising from consumer debt, (2) the defendant is a debt collector as defined by the FDCPA, and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." *Webster v. ACB Receivables Mgmt., Inc.*, 15 F. Supp. 3d 619, 625 (D. Md. 2014) (internal quotation marks and alterations omitted). Whether particular conduct violates the FDCPA is determined from the vantage of the "least sophisticated consumer." *Barany–Snyder v. Weiner*, 539 F.3d 327, 333 (6th Cir. 2008). "The basic purpose of the least-sophisticated-consumer standard is to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." *Nat'l Fin. Servs.*, 98 F.3d at 136. Under this standard, the court considers how a "naïve" consumer would interpret the debt collector's conduct. *Elyazidi v. SunTrust Bank*, 780 F.3d 227, 234 (4th Cir. 2015). At the same time, the standard does not require the court to "give credit to 'bizarre or idiosyncratic interpretations;'" rather, the court "assume[s] 'a quotient of reasonableness and . . . a basic level of understanding and willingness to read with care.'" *Id.* (quoting *Nat'l Fin. Servs.*, 98 F.3d at 136).

Elmore focuses its motion on the third element of the Benders' claims—it argues none of its conduct violated the FDCPA. With respect to the Benders' claims under § 1692c(c), Elmore argues no reasonable juror could find that Ms. Throop's initial remarks in the January 2018 phone call were related to the collection of the debt, and the Benders thereafter waived the protections afforded by § 1692c(c) by disputing the debt with Ms. Throop. As for the claims under §§ 1692e and 1692f, Elmore contends the Declaration clearly authorizes the costs and fees it attempted to

collect and the amounts were not otherwise misleading or unfair. The court will first address the alleged violations of § 1692c(c) and then turn to the §§ 1692e and 1692f claims.

**I.     Section 1692c(c)—Communications in Violation of a Cease Communication Directive**

Under 15 U.S.C. § 1692c(c) a debt collector is prohibited, subject to several exceptions not relevant here, from communicating with a consumer "with respect to" a debt if the consumer "notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer[.]" Elmore does not dispute that the Benders' May 18, 2016, letter was a so-called "cease communication directive" sufficient to trigger the protections of § 1692c(c) and to prevent Elmore from contacting the Benders with respect to the alleged debt. "Other than as permitted by § 1692c(c), a debt collector who has received a cease communications order from a debtor must not contact the debtor [regarding the debt] unless it has received a clear waiver of that order." *Clark v. Cap. Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1172 (9th Cir. 2006). Therefore, the questions in this matter are whether either of the 2018 communications constitute "communicat[ion] with [the Benders] with respect to" the debt, 15 U.S.C. § 1692c(c), and whether the Benders clearly waived the cease communications directive.

There is little authority construing § 1692c(c)'s language prohibiting communication "with respect to" the debt but the parties appear to agree that a debt collector's communication must have some "connection with the collection" of the debt in order to violate a consumer's cease communications directive. (ECF 12-1, Mem. at 12; ECF 29, Opp'n at 12). There is support for this assumption. The Court of Appeals for the Fourth Circuit has stated, in construing other provisions of the FDCPA, that "to be actionable under the FDCPA, a debt collector needs only to have used a prohibited practice *in connection with the collection of any debt* or in an attempt to collect any

debt." *McCray v. Fed. Home Loan Mortg. Corp.*, 839 F.3d 354, 359 (4th Cir. 2016) (emphasis added, internal quotation marks and alterations omitted) (quoting *Powell v. Palisades Acquisition XVI, LLC*, 782 F.3d 119, 123 (4th Cir. 2014) and citing *Sayyed v. Wolpoff & Abramson*, 485 F.3d 226, 229–34 (4th Cir. 2007); *Wilson v. Draper & Goldberg, P.L.L.C.*, 443 F.3d 373, 375–77 (4th Cir. 2006), *abrogated on other grounds by Obduskey v. McCarthey & Holthus LLP*, 139 S. Ct. 1029 (2019)). Moreover, the other provisions of § 1692c, which govern communication with consumers at particular times and locations, consumers who are represented by an attorney, and communications with third parties, explicitly prohibit certain communications "in connection with the collection of any debt." 15 U.S.C. §§ 1692c(a), (b).

Courts look to a number of factors to determine whether a communication is in connection with the collection of a debt, including the "nature of the parties' relationship," whether there was a demand for payment, and the objective "purpose and context of the communications." *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 385–86 (7th Cir. 2010); *see also Olson v. Midland Funding, LLC*, 578 F. App'x 248, 251 (4th Cir. 2014).[6] A communication is in connection with the collection of a debt if a review of these factors demonstrates that a communication was made to induce the debtor to settle the debt. *See Gburek*, 614 F.3d at 385. The court will first evaluate the January 17, 2018, call under these factors.

Evaluating the nature of the relationship between the Benders and Elmore requires consideration of the events that preceded the relevant communications in January and February of 2018. Importantly, it is undisputed that the HOA hired Elmore not solely for its debt collection services; Elmore has represented the HOA since 2006 as its general legal counsel. (ECF 12-3, E.

---

[6] Unpublished opinions are cited for the soundness of their reasoning and not for any precedential value.

Throop Aff. ¶ 3; ECF 13-15, Fee Agreement at 1). The Benders acknowledge that it was in this capacity that Ms. Throop initially contacted Mr. Bender following his letter to the Board of Directors to discuss his desire to attend the HOA meeting. (ECF 13-1, R. Bender Decl. ¶ 36). Mr. Bender returned Ms. Throop's call to discuss that matter and it was the focus of the first part of the January 17, 2018, phone call. Thus, it is not the case that "the only relationship between [the Benders] and [Elmore] was that of a debtor and debt collector." *Olson*, 578 F. App'x at 251. Elmore could have been reasonably expected to have business with the Benders relating to any number of matters associated with its duties as general counsel to the HOA, including debt collection and also "association administration, management, operation and protection." (ECF 12-3, E. Throop Aff. ¶ 3; ECF 13-15, Fee Agreement at 1).

The court next evaluates whether Ms. Throop's communications with Mr. Bender could be understood by an unsophisticated consumer as a demand for payment. While it is undisputed that Ms. Throop did not explicitly ask that Mr. Bender satisfy the debt, "a communication need not make an explicit demand for payment in order to fall within the FDCPA's scope." *Gburek*, 614 F.3d at 385. In a contentious conversation regarding whether Mr. Bender should be permitted to attend the next HOA meeting, Ms. Throop allegedly commented: "[W]ell, this whole thing would not have happened if you would just pay your bills." (ECF 13-1, R. Bender Decl. ¶ 40). Assuming for the purpose of the motion for summary judgment that this statement was made, Elmore argues this statement was simply part of Ms. Throop's past tense explanation of the reason for Mr. Bender's ban and thus was merely informative. *See Dyer v. Select Portfolio Serv.*, 108 F. Supp. 3d at 1278, 1281–83 (M.D. Fla. 2015) (letters sent to debtor which included loan resolution options but did not suggest that the debtor take any action were not communications in connection with the collection of a debt because they were only "sent to provide [the debtor] with information").

While a jury could well adopt Elmore's reading of the statement, Ms. Throop's use of the second conditional (i.e., "if you would just pay") suggests that payment of the debt was something she hoped for in the future. Thus, a jury could also reasonably understand the statement as an entreaty to Mr. Bender that if he were to pay his bills, "this whole thing," meaning the ban, would no longer be an issue.

As for the objective purpose and context of the communication, the phone call was precipitated by Mr. Bender's own letter to the HOA Board of Directors, in which he asked that someone call him about the issue of the meeting's location. (ECF 12-7, Jan. 16, 2018, Ltr.). Again, it is clear the initial subject of the call was Mr. Bender's ban from the HOA meeting location and his desire to attend the annual meeting, and it was in this context that the discussion of the debt took place. Even so, there is evidence that Ms. Throop was the first to turn the conversation away from the annual meeting and toward the debt, by remarking that Mr. Bender's ban was related to the Benders' failure to pay. (ECF 13-1, R. Bender Decl. ¶ 40). Considering Ms. Throop's dual role as the HOA's debt collector and its all-purpose general counsel, a reasonable jury could conclude that Ms. Throop had a dual purpose for the call—she could explain the reason for Mr. Bender's ban while subtly attempting to steer the conversation to the HOA's other issue with the Benders, the collection of the debt.

While the issue is close, considering the *Gburek* factors together, the court finds that, viewing the January 17, 2018, phone call in the light most favorable to the Benders and from the vantage of the least sophisticated consumer, a reasonable jury could conclude that Ms. Throop's comment, "this whole thing would not have happened if you would just pay your bills," was made to induce Mr. Bender to settle the debt and is thus a communication in connection with the collection of the debt sufficient to prove a violation of § 1692c(c).

12

Because the Benders have adequately supported their contention that Ms. Throop made a communication in connection with the collection of the debt before Mr. Bender broached the subject, the court is not persuaded by Elmore's argument that Mr. Bender's dispute of the debt during the January 17, phone call waived the cease communication directive for the purpose of Elmore's subsequent communications with respect to the debt, including Ms. Throop's reading from the Benders' account ledger and informing Mr. Bender of the lien on their property, and the February 6, 2018, verification letter. A debtor may waive a cease communication directive "only where the least sophisticated debtor would understand that he or she [is] waiving his or her rights under § 1692c(c)." *Clark*, 460 F.3d at 1171. Here, where the least sophisticated debtor may have understood Ms. Throop's initial statements as an attempt to induce payment, the same unsavvy debtor, rather than sensibly reminding the debt collector of the cease communication directive, could have reasonably responded as Mr. Bender did, by again disputing the debt, without thinking that doing so would give the debt collector leave to continue their attempts to collect.

*Scheffler v. Gurstel Chargo, P.A.*, 902 F.3d 757 (8th Cir. 2018), on which Elmore relies, is distinguishable. In that case, the Court of Appeals for the Eighth Circuit held that a debtor waived a cease communication directive when he called a debt collector and, without any prompting, asked a question geared toward resolving his debt. *Id.* at 763. Here, Mr. Bender did not proactively reach out to Ms. Throop, and though Elmore disputes it, Mr. Bender was arguably not the person who turned the conversation away from the HOA meeting and toward the Benders' debt.

Accordingly, because a reasonable jury could find that Ms. Throop violated the cease communication directive by steering her conversation with Mr. Bender toward the debt, the court will deny Elmore's motion for summary judgment with respect to the Benders' § 1692c(c) claims.

13

II.     **Sections 1692e and 1692f—False, Deceptive, or Misleading and Unfair or Unconscionable Practices**

Sections 1692e and 1692f of the FDCPA prohibit, respectively, the "use [of] any false, deceptive, or misleading representation or means in connection with the collection of any debt" and the use of "unfair or unconscionable means to collect or attempt to collect any debt." Attempts to collect amounts not authorized by the agreement creating the debt may violate both provisions. *See* 15 U.S.C. §§ 1692e(2) (the "false representation of . . . the character, amount, or legal status of any debt; or . . . any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt" violates § 1692e) and 1692f(1) ("collection of any amount . . . unless such amount is expressly authorized by the agreement creating the debt or permitted by law" violates § 1692f).

The Benders claim that the February 6, 2018, correspondence violated §§ 1692e and 1692f because it attempted to collect amounts, namely premature late fees and interest, costs, and attorneys' fees, that were not authorized by the Declaration or were otherwise misleading or unfair because they were inaccurate or unreasonable. Elmore asserts that summary judgment is warranted because all amounts it asserted were owed in the verification letter were expressly authorized by the Declaration and transparently disclosed. Liability thus depends in large part on the language of the Declaration and whether it creates each of the obligations in dispute: (1) late fees and interest; (2) costs; and (3) attorneys' fees.

The relevant provisions of the Declaration are contained within Article IV, "Covenant for Maintenance Assessments." (ECF 12-4, Decl., Art. IV). Sections 1, 10, and 11, explained above, address fees, interests, and costs related to the collection of and enforcement of assessments. The Declaration is a restrictive covenant, a "species of contract," the interpretation of which is a question of law. *City of Bowie v. Mie Props., Inc.*, 398 Md. 657, 682 & n.13 (2007). In construing

14

a contract, the court considers "the customary, ordinary, and accepted meaning of the language used" and "interpret[s] the language of the contract in context, looking at the entire language of the agreement, not merely a portion thereof." *Bainbridge St. Elmo Bethesda Apts., LLC v. White Flint Express Realty Grp. Ltd. P'ship*, 454 Md. 475, 485–86 (Md. 2017) (internal quotation marks and citations omitted).

### a.  Premature Late Fees and Interest

The Benders claim that Elmore attempted to collect in the verification letter unauthorized late fee charges for April 16, 2012, January 17, 2014, January 22, 2015, February 17, 2015, March 12, 2015, April 16, 2016, and January 18, 2017. (ECF 29, Opp'n at 21). Those fees are unauthorized, they contend, for one of two reasons—either they were charged too early, 15 days after the due date rather than an entire month, or they should not have been charged at all, because the Benders made the payment within the due date. As for interest charged, the Benders claim that a reasonable jury could conclude some part of it was also unauthorized as their payment history is not accurate.

Elmore argues, and the court agrees, that the record does not support a finding that any late fees were charged prematurely.[7] The Declaration clearly states that the due date for assessments "shall be established by the Board of Directors." (ECF 12-4, Decl., Art. IV § 10). The only evidence that sheds any light on the due date established is the account ledger sent to the Benders,

---

[7] Elmore makes the additional argument that the Benders are barred from challenging the authorization for the late charges because the charges were all assessed more than one year prior to the filing of the complaint and are thus barred by the statute of limitations. The alleged violation does not, however, stem from the initial imposition of the late fees; rather the claim is that the February 6, 2018, verification letter constituted a new unlawful attempt to collect amounts not authorized by the Declaration. Following the Court of Appeals for the Fourth Circuit's holding in this case that "each violation of the FDCPA gives rise to a separate claim governed by its own limitations period," the Benders' claims regarding the 2018 letter are for separate violations within the limitations period. *Bender II*, 963 F.3d at 405.

which includes a column for late fees titled "Late Fee after 30th." (ECF 12-5, Account Ledger). The title of the column is some indication that late fees were charged after they were a month past due, as the assessment charges in the ledger appear to have been levied on the first day of the month, (*id.*), as the Benders concede was permissible under the Declaration. The Benders submit no evidence of late fees charged any earlier.

Similarly, the record is devoid of evidence that Elmore attempted to collect unlawful late fees that were assessed on payments the Benders made on time. The Benders point to two quarterly assessments, October 1, 2015, and January 1, 2016, for which they say payment was made but a late fee was still charged. (ECF 29, Opp'n at 21; ECF 13-3, Apr. 21, 2016 Ltr.). For the October 2015 assessment, the account ledger shows no late fee was charged at all. (ECF 12-5, Account Ledger). And for the January 1, 2016, assessment, the account ledger shows a payment was made on February 26, 2016 (late even by the Benders' assumptions regarding the due date) via check number 1967. (*Id.*). In a letter to Ms. Elmore of Elmore & Throop, the Benders asserted that the same check number satisfied their obligation for the January 2016 assessment, (ECF 13-3), but they have not submitted any evidence that the assessment was paid earlier than the date shown in the account ledger.

As there is no genuine issue of material fact whether the Benders' payments were timely, it follows that there can be no claim that interest was charged without authorization or prematurely. The Declaration authorizes a maximum of 12 percent interest on any assessments "not paid within thirty (30) days after the due date." (ECF 12-4, Decl., Art. IV § 11). The Benders were charged no more than 6 percent interest on their assessments, well below the authorized rate. (ECF 12-5, Account Ledger).

### b. Costs of Collection and Attorneys' Fees

For its authority to collect certain costs of collection and attorneys' fees, Elmore cites Art.

IV, Section 1 of the Declaration: "The annual and special assessments, *together with interest, costs*

*and reasonable attorneys' fees*, shall be a charge on the Lot . . . ." (ECF 12-4, Decl., Art. IV, § 1).

The fact that "costs" and "reasonable attorneys' fees" are mentioned as charges that may be made

"together with" annual and special assessments suggests a broad authorization to obligate Owners

to pay any costs or attorneys' fees associated with the assessments. *See, e.g.*, *Bainbridge*, 454 Md.

at 490 n.7 ("Under the principle of *noscitur a sociis*, one may discern meaning by examining the

surrounding words."). But the Benders argue that the reference to costs and attorneys' fees in

Section 1 must be read in context with and limited by the HOA's authority to enforce a lien on the

property under the Maryland Contract Lien Act ("MCLA") and to bring an action against an owner

over unpaid assessments. In other words, costs and attorneys' fees are limited to those incurred by

either preparing and filing a debt collection lawsuit or filing a lien against the property.[8] In addition

to this limitation, the Benders contend that any attempt to collect costs and attorneys' fees is unfair

or misleading because Elmore's account ledger states inaccurate or unreasonable amounts.

### i. Authority for and Accuracy of Costs

Turning to Elmore's authority to charge costs under the Declaration, it is clear that neither

so-called "enforcement" provision indicates that the HOA intended to limit the assessment of costs

to those incurred in connection with litigation. Article IV, Section 11, which permits the HOA to

sue an owner for unpaid assessments does not reference costs at all and the HOA's power to

enforce liens under the Maryland Contract Lien Act exists "without limiting the powers of the

---

[8] The Benders' argument as to the authority for costs also focuses on the meaning of the phrase "cost of collection," a term that does not appear anywhere in the Declaration and thus is irrelevant to its interpretation.

Association" otherwise granted in the Declaration. (ECF 12-4, Decl., Art. IV § 1). In this context, the court concludes that the "costs" contemplated by Section 1 are not limited to litigation costs or those incurred in the judicial enforcement of a lien; the term also refers to costs associated with other legal actions short of filing a suit, such as notices and letters, that the HOA might reasonably employ and expect to have an owner pay for. The Declaration authorizes these costs associated with assessments as charges on a lot and as personal obligations of the owner.

Elmore's February 2018 account ledger contains a line item list of costs charged, broken down by the date, the amount charged, and a short description of each cost (e.g., 12/31/2013; $40.00; "level two title work"). (ECF 12-5, Account Ledger). Even the most naïve consumer could not construe such a transparent accounting as misleading or deceptive. Of the $287.00 in costs, the Benders point to only $40 worth of "PACER" charges that it considers "suspect," because the charges (four, at $10 each) never vary and exceed a general $3.00 limit for viewing one document, though they provide no basis on which to conclude the charges are each for only one document search. This speculative assertion about the propriety of a fraction of the disputed costs is insufficient to defeat a motion for summary judgment. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) (a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another").[9]

### ii.  Authority for and Reasonableness of Attorneys' Fees

The Benders' attempt to limit attorneys' fees to litigation costs also fails. Though Article IV, Section 11 of the Declaration does obligate an owner to pay the HOA's reasonable attorneys'

---

[9] Nor is this claim saved by the Benders' argument that discovery is needed to determine the actual PACER charges Elmore incurred. The Benders were required to, and did not, show by a Rule 56(d) affidavit that they needed additional evidence to oppose summary judgment. *See* Fed. R. Civ. P. 56(d).

18

fees in an action brought by the HOA over unpaid assessments, the inclusion of this provision makes it less likely, not more, that the "reasonable attorneys' fees" in Section 1 are limited to litigation costs. Because Section 11 explicitly provides for the imposition of attorneys' fees in connection with collection litigation, the reference to attorneys' fees in Section 1 would be superfluous if it were limited to those same fees. *See Nat'l Cas. Co. v. Lockheed Martin Corp.*, 415 F. Supp. 2d 596, 602 (D. Md. 2006) ("An interpretation which gives effect to all provisions of the contract is preferred to one which renders a portion of the writing superfluous, useless or inexplicable.") (quoting 11 Richard A. Lord, Williston on Contracts § 32:5 (4th ed. 1992)). The plain language of Section 1 creates an obligation for attorneys' fees associated with assessments.

Finally, the Benders assert that Maryland law allows Elmore to attempt to collect only fees that are reasonable under Rule 1.5(a) of the Maryland Lawyers Rules of Professional Conduct, Md. R. 19-301.5(a), citing *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325 (2010) and *Andrews & Lawrence Prof'l Servs., LLC v. Mills*, 467 Md. 126 (2020). Neither case supports the Benders' position.

In *Monmouth*, a homeowner's association initiated litigation under the MCLA against several residents for delinquent assessment payments. 416 Md. at 330. After the association was awarded judgment against the residents, it sought an award of attorneys' fees in court, using the "lodestar method" to calculate its desired fee award. *Id.* After state district courts reduced those fees, the association appealed to the Maryland Court of Appeals. *Id.* at 331. The Court of Appeals held that because the court's authority to award attorneys' fees stemmed from provisions of the MCLA allowing attorneys' fees provided for in a contract and not from a fee-shifting statute designed to reward counsel for undertaking litigation that furthers state public policy goals, the lodestar method of calculating fees was inappropriate. *Id.* at 334–36. Instead, court-awarded

attorneys' fees in private debt collection cases should be guided by Md. R. 19-301.5(a). *Id.* at 336–37. The case thus addresses only the standard to be used by *courts* calculating an award of attorneys' fees at the close of litigation—it does not address and does not bar a debt collector subject to the FDCPA from seeking to collect what it believes to be reasonable attorneys' fees that a homeowners' association charges, pursuant to a contract, against a property owner who is delinquent on their assessments.

*Andrews* is even less on point. In that case, the Maryland Court of Appeals held that the Maryland Consumer Protection Act (Md. Ann. Code, Comm. L., § 13-101, *et seq.*)'s statutory exemption for certain professionals undertaking "professional services" did not apply to a lawyer's debt collection activities that could be performed by any licensed debt collection agency not affiliated with a lawyer or law firm. 467 Md. at 150–56.

In the absence of Maryland authority to the contrary, the court finds persuasive federal authority that holds that "when a debtor has contractually agreed to pay attorneys' fees and collection costs, a debt collector may, without a court's permission, state those fees and costs and include that amount" in an attempt to collect a debt. *Fields v. Wilber L. Firm, P.C.*, 383 F.3d 562, 565 (7th Cir. 2004); *see also Bull v. Asset Acceptance, LLC*, 444 F. Supp. 2d 946, 951 (N.D. Ind. 2006); *Allison v. McCabe Trotter & Beverly, P.C., No.* 2:17-CV-1727-RMG, 2018 WL 3826674, at *3 (D.S.C. Aug. 10, 2018), *order clarified on reconsideration*, No. 2:17-CV-1727-RMG, 2018 WL 5122207 (D.S.C. Oct. 22, 2018) ("[W]hile courts in the Fourth Circuit have yet to address the issue, other courts have recognized that a party does not violate the FDCPA simply by including attorneys' fees in a debt collection letter without a court order."). *Fields* is instructive. In that case, the plaintiff's contract to pay certain charges incurred at an animal hospital included a clause that obligated her to pay "collection costs and attorney fees" resulting from any collection action

necessary to obtain money due under the contract. 383 F.3d at 563–64. When the plaintiff failed to pay the amount due, the hospital hired a law firm to collect the balance, and the law firm sent the plaintiff letters attempting to collect the debt, including attorneys' fees levied for the firm's collection services. *Id.* The plaintiff sued the firm under the FDCPA alleging *inter alia* that the letters were false or misleading under § 1692e and unfairly attempted to collect unauthorized fees under § 1692f(1). *Id.* at 564. The Court of Appeals for the Seventh Circuit held that the law firm's attempt to collect contractually authorized attorneys' fees did not by itself violate the FDCPA, but concluded the plaintiff's claims under §§ 1692e and 1692f were plausible because the firm had not disclosed in its letters that the increased amount due stemmed from the imposition of attorneys' fees. *Id.* at 565–66. The court noted that the law firm could have avoided liability had it "itemize[d] the various charges that compromise the total amount of the debt" so as not to confuse or mislead the consumer regarding the character of the debt or the amount owed. *Id.* at 566. Elmore has done just that here. The account ledger provided to the Benders itemizes costs, attorneys' fees, interest, and late fees clearly and explicitly. (ECF 12-5, Account Ledger).[10]

*** 

In sum, as Elmore was authorized under the Declaration to collect attorneys' fees, costs, interest and late fees and those fees were clearly disclosed to the Benders, no reasonable jury could find Elmore's attempt to collect these amounts violated the FDCPA. Accordingly, the court will grant summary judgment to Elmore as to the Benders' §§ 1692e and 1692f claims.

---

[10] Of course, the conclusion that Elmore's attempt to collect attorneys' fees did not violate the FDCPA does not prevent the Benders from negotiating those fees or contesting their reasonableness though a separate legal action. *See Fields*, 383 F.3d at 565; *Bull*, 444 F. Supp. 2d at 951.

**CONCLUSION**

For the foregoing reasons, the court will deny Elmore's motion for summary judgment as to the Benders' § 1692c(c) claims and will grant the motion as to the Benders' §§ 1692e and 1692f claims. A separate Order follows.


3/30/2021
————————————
Date

                                            /S/
                              ————————————————————————
                              Catherine C. Blake
                              U.S. District Court Judge


22